Good morning Judges of the Seventh Circuit Council. My name is Rex Andre and I represent the Defendant Appellant Egan Marine Corporation in this case and on behalf of that corporation I'd like to thank you for the opportunity afforded us this morning. It probably come as no surprise to anyone that I wish to take advantage of this opportunity to further address the issue of collateral estoppel because I believe it effectively moves all of the other issues in this case and I'd like to focus on a few things that trouble me about how this doctrine was applied in this case. First off the issue of the issue preclusion at least as it sets up in this case pits a doctrine that has deep common law roots and is also embedded in the Constitution which is what our position is grounded on against a rather general and open-ended public policy argument which is what the government relies on. And if General Justice Sotomayor Mr. Andre, the government asserts that it twice moved to stay the pending resolution of the criminal case and that Egan Marine objected to the stay which the court then denied. Does that weaken your arguments about the unfairness of being subjected to two trials do you think? I don't think so Judge because it's true that the civil case was brought first the government had the opportunity to decide what case they wanted to bring and what case they wanted to bring first and they brought the civil case first and they were litigating heavily against Egan Marine and I think and of course I wasn't involved in that case but I think they were already deep in the thick of that case at the time that the government brought that motion. And so getting back to what I was saying here I'm concerned that if these general public policy type of arguments start to trump long-standing constitutional doctrine as it has in this case. Issue preclusion is not a constitutional doctrine well it's just a common law doctrine so I'm interested in how this has been understood in other circuits. Do you have a full count of where the circuits stand on this? There's not many cases in this particular area where you're trying to what you got the application of collateral estoppel in a criminal case based on a prior civil case. There's very very few cases in fact we've got the United States Supreme Court decision in Yates, we've got the application in Sandheffer although that really that was a criminal criminal case and we've got this. Well let me say the United States says that the Ninth Circuit and the Tenth Circuit have both held that issue preclusion from civil to criminal is appropriate. That's the Weems and Rogers cases. Right. Do you know of any others? I whether the doctrine is mandatory or whether it's discretionary in these circumstances. Judge Zagel said he would not apply it even even if it was discretionary but he really gave no good reason for that that I could find. Can you help with that at all? In terms of what Judge Zagel's reason was for not applying it? Yes. I think he I think he felt that he would extend this court's decision in the Alexander case to that case and maybe read this court's decision in that case more broadly than it should have been because I mean that case was a different case in kind. It was very it was an administrative proceeding that was only a hearing. It wasn't a fellow district court judge who had made the determination. It wasn't a decision. I don't think you have to spend too much time on Alexander. This circuit's rules require a panel to circulate any opinion creating a conflict and the Ninth and Tenth Circuit cases long preceded Alexander which therefore did not think it was creating a conflict among the circuits. Okay I won't spend any more time on that case then. The second thing that concerns me and this is gets to your question Judge Rovner is how I think in this case the financial impact on the government of the application of this doctrine seems to have been elevated above the hallmark of the concept of collateral estoppel doctrine is that it's there in part to protect the little guy from the big guy and when you come to when it comes to big guys they don't get much bigger than the government. In all of the cases reference how the government is able to wear defendants down it's kind of a core principle but in this case it seems as if Judge Zagel came up or at least the government is advancing sort of a new paradigm where the primary concern is the government's resources and how they allocate it with a new primary objective which is no longer protecting defendants from civil or serial litigation. Primary objective now seems to be to remove any restraint on how the government chooses to spend its resources in prosecuting defendants and I'm concerned about how that is sort of a notion that's a bit violent to the foundational principles of the Constitution and the final thing that bothers me. I just don't see how the Constitution gets into this. Well I've read some cases where that it indicates that this doctrine sort of arose out of the due process clause of the Constitution and is closely related to double jeopardy. Is it is it any part of your argument that if Congress by statute modified the rules of issue preclusion that would be unconstitutional? Well I find that inconceivable. Well I don't have that argument in front of me and it's a good question your honor and I confess I didn't prepare to answer that question but I. You don't want to rely on the Constitution gratuitously or you get questions like mine because if you think your client's success in this case depends on the answer to that question you have lost. Okay your honor. The final thing that bothers me I guess here about the application of the collateral estoppel in this case is how the constant how the criminal court sort of turned the doctrine on its head when it's one of the things when it explained why it hadn't applied the doctrine in this it said that the government had done a better job the second time around and case law does tell us that that's precisely one of the reasons that you don't why collateral estoppel forbids a do-over. You know that witnesses will be sharper, their answers will be more polished on cross-examination, the presentation will be more refined, unsuccessful theories that were advanced will be dropped in this case we had in the first trial that maybe Alex Oliva had lit a cigarette that was dropped for the second criminal case and in other words the United States Supreme Court and Ash has recognized the impropriety of allowing the government a dry run chance to plug holes in its case and legal scholars have warned that the availability of a discovery tool would encourage slipshod performance the first time or use of the first proceeding as a discovery tool and I think we see embodied in this case. I'm not sure what's wrong with that since discovery is entirely permissible why is using something as a discovery tool problematic? Well it's problematic in a criminal case if the end objective is a criminal case to prosecute a defendant where you use the the first case to sort of flesh out all of the defenses. I just don't see why that's problematic. Well I think in the criminal context to give the government that chance to sort of dig in and make the defendant expose everything that he or she would present in a criminal defense and then be able to sort of retool their case for that purpose I find to be sort of contrary to the principles of our of our system. Could I take you somewhere else? Sure. Because time fleets. You know you argued that the mens rea of an employee cannot be imputed to a corporation but how could a corporation ever be held criminally liable then? How can a court determine a corporation's mens rea without examining the intent of corporate officers or employees? Well I guess you're talking about the the issue about the manslaughter, Seaman's manslaughter statute and the question of whether a corporation would be properly held liable under that statute and I understand what you're saying in terms of the imputation of a an employee's act or perhaps state of mind to a corporation. I guess what troubles me about that particular statute in this the statute itself doesn't seem, we've got a statute that basically said owner right from the beginning back in the well actually back in 1864 I think is when the word owner first appeared in that statute and the idea is that a corporation can be an owner at least that's what the government's position has been and it's true that that statute at that time only provided as punishment for imprisonment and so if to the extent that a corporation was contemplated to be an owner it doesn't seem to make a lot of sense because you can't put a corporation into prison. In terms of the the mens rea article or issue I guess one of one of the things that concerned me in this particular case is that the use the ordinary standard of care and use ordinary negligence and in this particular context with the manslaughter statute which you tend to see in manslaughter cases is something more than that a sort of a gross negligence standard and the other thing that happened in this particular case is when the sentencing hearing began and the criminal court judge took a look at the ran into a problem because in that context the sentencing guidelines discussed gross negligence and it seemed to me that the sentencing judge, Judge Zagel, was running into some second thoughts about this case. He was troubled by the fact that the sentencing guidelines reference criminal recklessness as a gross deviation from the ordinary standard of care and there were no cases that defined ordinary standard of care which I think in his mind was in my mind to reveal that a criminal prosecution under the facts of this case is pretty unprecedented and the second thing. Is that right and only one other such case? Yeah one prior case in 1904 and the second thing that bothered the judge was that he was looking at the government's restitution arguments and they seemed to him to be arguments for civil damages in a civil case and then in the next hearing he begins talking about this case as a black swan which is a reference to the sheer improbability and unforeseeability of this explosion followed by sort of the after-the-fact rationalization with the benefit of hindsight that well the event was somehow predictable or foreseeable. Judge Zagel then talked about how scientific lines had been crossed in this case and given that the due process clause of the Constitution requires proof beyond a reasonable doubt of every element necessary to constitute a crime. It I think raised the specter of a whole in the criminal negligence case as to the element of reasonable foreseeability and then you see these kinds of things being played out during the sentencing hearing but never really resolved. It seems to me that Judge Zagel sort of decided that he would let this court decide this and then we also have the fact that as part of the reasonable foreseeability problem is this angle where Exxon had loaded this boat with light hydrocarbons that were was not really a true grade E cargo and so it calls into doubt I think whether the ultimate harm that happened was reasonably foreseeable. Thank you, Judge. Ms. Christensen. Thank you, Your Honor. May it please the court, counsel. Good morning, my name is Joanna Christensen and I represent Dennis Michael Egan, the appellant in this case. I'll be talking about two of the issues that we raised primarily the Miranda issue and the Daubert issue. Both of these issues suffer from the same basic flaw, the district court's failure to make adequate findings or findings at all on the issues when they were presented to him. On the Miranda claim, did Mr. Egan file an affidavit or otherwise allege facts regarding whether he was in custody? What unresolved question could a hearing have resolved for the Miranda claim? He did not file an affidavit but they did allege facts that would have shown that he was in custody and interrogated at that point. I think that a hearing definitely would have brought out what exactly the circumstances were from both parties point of view. We have police reports and Coast Guard reports but they are somewhat conflicting about who interviewed who, when, where, what questions were asked, what the answers were, the order of the interviews. I think that there are several factual questions that remained regarding the Miranda argument that were brought before the district court several times and the court just flat-out failed to rule on them and then relied on those statements in his ruling on guilt. A lot of different agencies arrived shortly after his call, correct? Almost every agency. And is this the interview process or the time of the interview that you're talking about? Yes, he was essentially pulled over in his tug, as the captain of the tug, by a Chicago PD police boat. So there was, and the government likens that to a traffic stop, well perhaps at the initiation it was a he was asked to get off of his tug. They were going to tow him in at some point, not just pull him over, they were going to tow him in. And then when they do get on shore, one of the fire investigator, the fire supervisory fire marshal, starts asking questions about the cause of the explosion. Well first they put him into a small shack. Yeah, it's a little unclear when that happened in the It was January, of course, and I believe there was some precipitation. So they did at some point move into a shack at the Sitco facility and then asked multiple questions with 12 people present. From different agencies? From different agencies. The people who are the main interviewers were someone from the Chicago Fire Department, the fire marshal, though he soon gave over jurisdiction to the Coast Guard. The ATF was there and then the Coast Guard. And how long a period of time do you allege that this interview was around half an hour, 45 minutes? I think the time period is about when, you know, everybody converges on the scene. They're trying to figure out partially how to fight the fire because they need to know what was on the boat or on the barge. But what's in the record that we know is about half an hour, 45 minutes that he was questioned. He was questioned at least twice, once just by the fire marshal, the very initial, and then there were more questions later on by this group of people. And when you're looking at a reasonable person, what would a reasonable man think in this situation? Yeah, I don't think there's anybody in this room that would say that he didn't think that he was in custody, not under arrest, I don't think he thought that, but that he was in custody and that he could not simply walk away. The nature of the situation was that he was looking for his crew mate and and he could not simply just leave the scene because they were investigating him. It's also clear that they were investigating either terrorism or, um, they had drug sniffing dogs, some sort of act of obvious criminality. In that case, we have to remember when it was. It was 2005 January. We all were under higher alerts then because of these kind of incidents bring every law enforcement agency possible and the people who are involved do not feel free to leave. And he certainly was. Well, could have refused to answer the questions that I understand that that probably would have escalated the situation, but he probably would have received warnings at that at that point. Yes, I think that it's possible he could have refused, but only in the most basic sense that we all can refuse to answer questions of law enforcement officers. I don't think reasonably in this situation he could have refused without dire consequences to himself. Well, you raise following that line and Judge Robner's question, you raise also use immunity. And I know you said that wasn't you were to address Miranda and Albert. But how do you Is there some conflict here to where you think he had this duty to report and answer questions and the Miranda issue? They are kind of when I said Miranda was an arching, they are kind of part and parcel. And I use immunity does come into play here because the purpose of this use immunity is to assist in the recovery and cleanup and not to dampen someone's desire to tell authorities what's going on. So the authorities can address the potential pollution, the life, destruction of property. And it's not a provision that is used very often. It's very similar to the Siemens manslaughter. You don't see this provision used very often. There are only two cases that either party really cited there and they're opposite of each other, the most district court cases. But in this case, when he immediately calls to say this happened and then immediately is talking to investigators about what could have happened, possible ignition sources, possible accidental events, that should all fall under use of immunity for the public policy issue. Ms. Christensen, I know that you want to get on to the Dalbert, but there's I really need you to answer. I'm here to do so. I know and I appreciate it. Short before the explosion, Olivia was sent to the CSO. If the pump was not frozen, if the thermal trace line was attached, what preparation was needed other than thawing the pump? In other words, what preparation could be needed? Can you help me with that? I can try. This gets into a little bit more of a scientific background than I have. But what I the pump froze up, not necessarily the CSO within the pump, but the clutch on the pump. And he needed to go, what was used in vernacular, is bump the pump. I believe Bill Rogers testified that he knew Olivia was going out there or Oliva was going out there to bump the pump or bump the clutch on the pump. So there was a series of, they had to prepare to offload. And even if everything was hooked up appropriately because of the cold temperatures, they would have to make sure that it was all going to work when they got there. So that's the explanation from the record. But there was testimony that Mr. Egan told authorities that Olivia was on the barge in order to warm up and start the pump. Why did the pump need to be warmed up if the thermal trace line was attached? And what means other than a torch could have been used to warm up and start the pump? Does the record answer these questions? Really, as far as we get in the record about those questions, is that steam would have been used more likely than a blowtorch. Fazioli, who testified at the sentencing hearing, stated that warming up this pump with a torch would not be effective. It would not warm up enough of the CSO to get it moving within the pump. And if this had been standard practice to warm it with a torch, there would have been scar marks, torch marks on the pump, and there were not. The other thing I would add about that is that this process, they had done two other runs of CSO immediately before this third run, and they all went smoothly. So if this was a standard process that they were using to start the pump, it would have gone wrong much sooner than this if it was a standard practice. And it wasn't a that part of this goes back to the Miranda issue, because when Dennis Michael said, you know, it's possible there is a torch and propane tank on board, people don't understand, and I certainly didn't understand before I took this case, that there are two different vessels. The barge is a vessel and the tug is a vessel. The propane torch and tank can be on board the tug, but could not be on board the barge. So then it becomes a game of telephone when he says it's possible, he's very distraught, it's possible that it was on board. It becomes, and then he also says that Oliva went out to bump the pump to get the pump started. Those two were converged by people who perhaps didn't understand the way these things worked. And then it became this larger scenario that the government's latched on to. And I see that I am in my rebuttal time. I just want to highlight on the Daubert, the problem really here is the district court judge did not make findings at all about the Daubert factors. The district court's findings are on page seven of our appendix. They simply talk about the differences between experts and experts can disagree and that someone won the Nobel Prize even though they disagreed. There aren't any findings about reliability or error rate or testability of Tchelsky's findings. Nothing that really follows the Supreme Court's rules in admitting expert testimony. So I'd like to, unless there are other questions, I'd like to reserve my time for rebuttal. Thank you. Certainly, counsel. Mr. Chaffin. May it please the court. My name is Timothy Chapman and I represent the United States. I would like, I'm going to start out, please. One of the weakest parts of the government's case is its proof that the standpipe was open at the time of the explosion. That proof is based on the testimony of Tchelsky and his testing, frankly, was very, is very difficult to agree with for me. How on earth can you simulate the forces of an explosion of that magnitude with a man wielding a three-pound hammer? Other than speculation, how do we know what happened to that pipe, to the valve, to the handle on the valve during that explosion? It all seems wildly speculative to me. Give me your best evidence that the pipe was open. Your Honor, several things. First of all, the pipe was, the standpipe was recovered from the canal in the open position. There was no handle on it, nor was there a cover on the pipe itself. So it was located in the open position. And the district court credited David Tchelsky's testimony because his testing was not designed to recreate the explosion itself. Mr. Tchelsky made that very clear. The goal of that testing was not to simulate the explosion. It was to address a specific assertion that the owner of Eagan Marine Corporation had made. Namely, whether, if there had been a handle attached to it, or if there had been a cap on the end of the ball valve, whether the explosive forces could have removed those items during the explosion, and with the resulting lack of damage that was on the ball valve handle and on the threads inside the ball valve. So Mr. Tchelsky, and this is an important point, was not attempting to recreate the explosion. He was simply trying to do what the ATF Fire Research Laboratory always does, which is do scenario based testing and then evaluating afterwards to see if what's the damage that arises from the testing itself. Well, Eagan, in the briefs, Eagan Marine asserts that the government's own expert, Mr. Karkosiak, after hearing evidence at trial, was no longer willing to opine that the disconnection of the heat trace line fitting from the cargo pump occurred before the explosion. I mean, what should we make of that? Is there any reason that a crew member would disconnect a working thermal system from a pump, allowing it to freeze? What was the government's best evidence that the cargo pump was not being heated by the working thermal system? Your Honor, there were several pieces of evidence, which all are very powerful. The first and most powerful piece of evidence were the admissions of Dennis Michael Eagan on the evening of the explosion, that his crew utilized a propane torch to heat the cargo pump under cold weather conditions. If the thermal fluid line had been attached to the cargo pump, there would be absolutely no need to use a propane tank. Second, you had the testimony of Mr. Karkosiak, and respectfully, we believe that EMC grossly mischaracterizes the import of Mr. Karkosiak's testimony. When the cargo pump was pulled out of the canal, and there are photos of it being pulled out of the canal at the time it was taken out of the canal, there was a piece of metal tubing attached to it, which is where the hot oil from the thermal fluid system would go, and on the end of that line, there was a thing called a compression fitting that was manufactured by Mr. Karkosiak's company called Swagelok, and that fitting was undamaged. And what Mr. Karkosiak did was analyze it, and based on the nature of that fitting, there's a mated fitting that would have had to have been there if the system was attached at the time. And what Mr. Karkosiak testified to was the nature of Swagelok fittings is that they're so tight that if the explosive forces had pulled those two mated fittings apart, it would have been completely torn to shreds inside the fitting, but the fitting wasn't. It was in perfect condition. In fact, he could put another attached fitting directly onto it. So a perfect half of a Swagelok fitting came out of the canal attached to the pump. That would suggest that the thing was not attached at the time of the explosion. Did Egan actually say that Olivia used a propane torch? Mr. Karkosiak did not opine about anything other than the nature of the Swagelok fitting. But you... I thought you just said that there's other factors here, and you said Egan's statement said that somebody used a propane torch. Did he say used? Yes. Or that there was one on the, as Ms. Christensen said, available. I think both were there, that you had the testimony of multiple interviewers who said that they had a propane torch that they used for the purpose of heating the cargo pump under cold weather. But they didn't say... He didn't say he did it today. Did he? He did not say that. That's correct, Your Honor. He did not say that. And I'm terribly upset about the chain of custody here. Some of the key evidence sat unattended in a trailer for years. It was carried back and forth to hearings. It was clean with gasoline and altered. And there is not even much certainty with how it was collected from the water and how it was manipulated during collection. I mean, if you look at photos, which I have, of the pieces of the barge being lifted from the water, it's attached to chains. It's being pulled up through the water and through debris. I'm not suggesting, please, I'm not suggesting deliberate interference with the condition of the evidence, but I am suggesting that it was handled in a manner that does not possibly befit criminal charges for the second time in 110 years. Well, Your Honor, the testimony as a whole established that the divers, and the divers who recovered these pieces, testified. And they talked about how carefully they moved through the water, how they chained the pieces to prevent injury to themselves and to prevent damage, how they're carefully lifted out and then placed with the crane, because they're so heavy, and then placed on the Sitco property. Once they're placed on the Sitco property, they are under Coast Guard control throughout the entire time. Commander Hamilton testified to the fact of how he came across the... How he first observed the barge, attempted to position it, it broke free. After that, he took possession of it and maintained it. At trial, he testified that the standpipe as presented to him was in substantially the same condition as it was when he first saw it, way back at the scene after it had been removed from the canal, except that the end of the ball valve on the end had been cleaned off. The criminal agents did that to examine the ball valve, the threads and the handle, and to make sure that the rotating cylinder inside that ball valve was still there. So those agents testified to why they cleaned it. I'm sorry, Judge. No, no, go ahead. No, they testified to why they cleaned it, how it had changed, they photographed it before and after, and at the trial, we presented photographs of how the ball valve appeared when it was recovered and located at Sitco, as well as before and after the cleaning. And so, the district court concluded, we think properly, that these issues, the things that Egan complains about, really go to weight rather than admissibility. Those are certainly limiting factors that they can level an attack against, which is exactly what they did, but they go to weight, not admissibility. The evidence was still highly probative, especially the fact that the threads inside the ball valve and on the ball stem were relatively undamaged. And this goes back to the purpose of Tucholsky's testimony, because his testing, his scenario based testing was designed to see, to evaluate damage that would have occurred if the explosive forces had greatly damaged the threads on the ball valve or on the ball valve handle. And I do... You know, finding that Olivia was using a torch at the time of the explosion, the district court seemed to have engaged in some bootstrapping logic, hypothesizing that he must have been using the torch because there was no other open flame. And that seems speculative. And it doesn't take into account that the cause of the explosion might never be explained. It would seem that most explosions, you know, are mysteries. What is the best objective evidence that Olivia was using a torch at the time of the explosion? And where in the record would we find this evidence? It would be in the testimony of Dr. DeHaan. Dr. DeHaan went through and analyzed all of the other potential ignition sources. Every explosion, Your Honor, every ignition of a flammable vapor has to have an ignition source. And so what Dr. DeHaan testified to was all of the other possibilities, and he excluded all of the other possibilities. Even Dennis Harry Egan, the owner of Egan Marine Corporation, eliminated the possibility that the spark could have been a competent ignition source because he very confidently stated that his crews only use tools that don't cause sparks, that are non sparking tools. Well, Egan Marine argued that a disconnected trace line would have spilled thermal fluid on the deck, and there was no evidence of such a spill. And they argued that the blow torch would have left scorch marks, but there were no scorch marks. And I saw no response from the government on these points. I mean, I might have missed it, but I don't think so. Would you like to respond now? I would, Judge. We did respond. A lot of these facts are addressed in our very lengthy closing argument brief. It does contain record sites to the evidence on those particular points. One of the important things to remember is that, about the thermal fluid system, is that you can valve off that system. It runs to... There are lines that run to the cargo tanks, but there's also lines that run across other piping and to the cargo pump. But those pieces can be valved off. Geoffrey Brown Barrick, Egan Marine's own employee, very clearly explained at trial, under cross examination, that you could valve off certain portions of the barge. So if the cargo pump was disconnected from that system, there was a way to do that while still using the rest... Using the thermal fluid system for the rest of the barge. You could absolutely do that without shooting oil all over the deck of the barge. Again, we just think that's a mischaracterization of the evidence. Now, can we talk about Miranda for a minute? Certainly. The government contends that Dennis Egan was not in custody when he was questioned. Does the government dispute his characterization of the circumstances of the questioning that he summarized on pages 10 and 11 of his reply brief? Are you contending you were free to leave the scene without answering at least some of these questions? These are all assertions for which there is no citation in the record. When Judge Zegel was given the motion to suppress, he was confronted with a motion to suppress that was only two pages long, and it only alleged that there had been a explosion of the Lisa E. Tow Boat, and that after that, the responders were interviewing Dennis Michael Egan. Those facts, as the District Court correctly concluded, made out nothing more than an assertion that authorities were doing every reasonable thing they could do in response to a massive explosion. Obviously, when they went out there, they were unaware of what had caused the explosion, and they were interviewing him as the master of the vessel to get more information to determine what the possible cause of the explosion might have been. Nowhere in the motion, the motion to suppress, did Dennis Michael Egan ever say that he was handcuffed or physically placed into custody, told he was under arrest, told he was not free to leave. No, but it's taken by police into a tiny little shack, and 12 different people are asking questions, and the man, of course, must have been beyond devastated. His friend, his crew member, is missing. He was, and I believe some of the interviews talked about the fact that he seemed sad and he seemed upset, but it's an objective test, and any reasonable person, certainly any reasonable innocent person, in Egan's situation that night would have believed that the reason he was being questioned by all these responders was not because they had decided to focus on him as a target of a criminal investigation. They were trying to understand what in the world had just happened, and maybe what the cause was. Who knows what's going through people's minds when 12 different people, some law enforcement, some not, are shooting questions at you. That's not fair. Well, I mean, I don't know what they were thinking, but importantly, even with the admissions that he made that night, he was allowed to leave. One of the other crew members, the brother of the deceased crew member, was allowed to leave the scene so he could go be with his family. And a lot of the facts, Judge, I think appear in the reply brief were not in the original motion, which is why when Judge Zagel denied it, he basically told the trial court counsel, which was not Ms. Christensen, but he told the district court counsel that he should allege more facts because the bare bones motion simply didn't rise to the level of demonstrating custody for Miranda purposes. And instead of doing that, instead of submitting an affidavit or alleging the facts, what he did was he went for the use immunity motion that followed after that. I do wanna say briefly about the use immunity motion. The purpose of the use immunity motion is not, as counsel suggests, to give the government more information to foster the recovery. The initial notification is there and the required notification under the Oil Pollution Act is there. It's mandatory so that the government can be aware of an oil spill so that it can react appropriately at the time. The use immunity provision eliminates the Fifth Amendment problem that comes with compelling a master of a vessel to report their own oil spill, knowing that that compelled notification could later then be used against them as an incriminating statement. So the use immunity provision eliminates that problem. At the time, Dennis Michael Egan was being interviewed by these responders out at the scene, there was no need for any notification. That's why they were all there. Everyone knew the explosion happened. Everyone knew the oil spill had happened. This was hours, maybe hours after the explosion itself when these interviews took place. And most of the discussion was not about, was there an oil spill? It was about what happened, what was going on on the barge at the time. How could this possibly have happened? That's what the question was. And it's important to note, even Egan's own argument is that he was not trying to be interviewed. He was trying to stay on the canal looking for his crew member. He was not seeking out the interviewer so he could report an oil spill. He was pulled over and then they sought him out so they could obtain more information. The use immunity provision clearly is limited to notifications to the National Response Center. There were Coast Guard and EPA regulations in effect at the time that specifically designated the National Response Center as the sole agency to which the notification required under the Oil Pollution Act must go. I don't want you to leave without answering this for me on the issue of restitution to NPFC for Megan Marine, the company he pointed out on page 23 of its reply brief that the government relies on but that section requires that the restitution be in accordance with sections 3663 or 3663A. How did the restitution here meet that condition? Do you know? It didn't meet that condition, but they cite to the wrong provision of the probation statute. The right subsection of the probation statute is 3563 subpart B. It's in subpart B. Say it again. 3563. Subpart B. Subpart B, which sets forth the discretionary conditions of restitution that a district court is allowed to impose. They only cited 3563A, which relates to the mandatory conditions that the district court must impose. But as this court concluded in Hasbrook, the probation and supervised release statutes provide a completely independent basis upon which to impose restitution in a case like this. And that authority exists without respect to the Mandatory Victim Witness Act or the Victim and Witness Protection Act. And Mr. Chapman, one more, and I'll try to let you alone. You're fine, thanks. Thank you. What is the best record evidence that Egan Marine knew that employees sometimes used a torch to heat that pump or that the company approved of such a practice? What I'm trying to discern here is what is the evidence of corporate knowledge and intent? His knowledge is equivalent to corporate knowledge. He is the master of the vessel. He is operating the vessel within the scope of his employment as master of the vessel. And the evidence consists of his admissions and also the admissions of a crew member, Bill Rogers, of similar import, which is that they used a torch to heat the pump under cold weather conditions. You had the testimony of a fire marshal. Did he say how often or if it was a very unusual circumstance? I believe the testimony was the effect that he made some comment that it would not be the regular practice or the accepted practice or something along those lines. But the testimony was very clear that they were asking him about heating the cargo pump and that he was specific to the fact they would occasionally use a torch to heat the cargo pump. He did not specify, I believe, how often the practice took place. Along those lines, though, if Egan had transported this cargo numerous times over years for Exxon, what was different about this load that, assuming they used the torch before, what was different about this load that the torch would somehow ignite this load that it never did before? We don't think there was anything different about this load. This was ordinary clarified slurry oil. No, but wasn't this load, didn't this come from some other place in the in the loading process from Exxon? Wasn't there a, there were two previously one, previous ones, and wasn't this third one for some reason from a different tank, so to speak? It was from a different tank, Your Honor, but... From Exxon. Right, and I need to drop back and give you a little more background in order for this to make sense. When Exxon processes their petroleum, CSO is sort of the dregs that come off the bottom of a unit called the catalytic cracker, and then those, that CSO flows through dedicated piping to one of two big tanks, 515 and 516. Those tanks don't get anything else. They only get clarified slurry oil. What happened on the evening of the explosion was that when the, they lost steam heat to one of their valves, they couldn't discharge the CSO. It's a good example of how this CSO does heat up under cold weather conditions, and it is a CSO to answer, go back to Judge Rovner's question, that locks up inside the pump. It's not the clutch that freezes up, it's the CSO inside the pump. And likewise, so Exxon had that problem. So what they did was they shifted the incoming CSO to another tank and moved some of the CSO from the other tank into the other tank, and then loaded the barge that way. So there was a movement of the tank from which they were loading the barge, Your Honor, but there was never anything added to it. Egan has always pressed, in this case, what we call the hot load theory, which is that somehow Exxon spiked this load with some light hydrocarbons and created this, they say in their brief, a floating bomb. Testing from the barge on the night of the explosion indicates it was ordinary CSO, it was a grade-E cargo, which is exactly what they were contracted to carry. And the only evidence to suggest otherwise, frankly, was an expert that they called at sentencing, not at trial, a guy who was completely unqualified, who, and I'm not making this up, all he did was look at a photo of the orange fireball explosion and say that based on his knowledge of marine safety, he was a marine chemist, that based on a single photo of an orange fireball, he concluded that the CSO must have contained something other than ordinary CSO. That is contrary to the testimony of all of the Exxon employees who testified, who said, nope, this was just ordinary CSO. The tests and analyzed the CSO realized that it was just ordinary CSO. And even if it wasn't, the reality is the use of an open flame on a barge is still legal negligence. Even if there had been some other light hydrocarbons, it doesn't make the use of an open flame any less dangerous, unlawful, or negligent. That would have always been the case. Thank you. With regards to the pledge, I'm sorry. How do you explain no torch marks? How do you explain no evidence of a spill? How do you, how do you? The torch marks here, I believe Dr. Hahn testified that being in water, the pump was in underwater for several months, and depending on the residues or what's on the outside of the pump, like residues, debris, rust, those sorts of things might retard the inability of the pump to receive scorch marks. So he didn't think it was, I mean it's certainly not an absolute thing that would be required, and I think to the extent, you testify that they would expect there to be torch marks, that person certainly wasn't a metallurgist who had an expertise in metal and, you know, torch marks being applied to metal. With regard to collateral estoppel, I'm sorry, Your Honor, did you? No, I just breathed. Okay. Sorry. With respect to civil to collateral estoppel, I think applied the Alexander policy principles in a straightforward way. Alexander does not speak in terms of administrative versus civil district court proceedings. It speaks of non- criminal proceedings and using non-criminal to criminal collateral estoppel. The policy concerns are very real. If you impose non-criminal to criminal collateral estoppel, there will, in most cases, certainly in cases where there's parallel civil and criminal proceedings, there will be immense burdens that get pushed upon the government. The government may be forced to delay proceedings until the very last minute so as not to potentially trip up a criminal case, or they might have to forego civil proceedings altogether, and all that we submit would be contrary to the intent of Congress. Congress has passed these laws to allow a regulatory government to function in both the civil and criminal context. You know, this is allegedly the second such example in the history of 1115 where a corporation, as opposed to a corporate officer, was held criminally liable for manslaughter. I mean, for a statute that has been in existence so long as this one has, I'm troubled that no one else has been reading the law the way the government urges us to read it now. If your reading is correct, why do you think there's so few instances of the law being used in this manner? Judge, every case turns on its own facts, and I certainly don't have an awareness of whether there were conscious decisions by prosecutors elsewhere to only prosecute a master of a vessel or an individual as opposed to the corporate entity for whom that master of the vessel was employed, but the statute clearly does contemplate the prosecution of any owner, and a corporation, of course, can be an owner of a vessel, and then if we look to the second paragraph of 1115, the first clause of that paragraph clearly contemplates the prosecution of an owner. It says when the owner of any steamboater vessel is a corporation. So the statute clearly contemplates the prosecution of a corporate entity, and the second paragraph does that right before it moves on and carves out additional liability for executive officers of that corporation under a different sienta requirement. They have to, unlike the first paragraph where individuals and corporations can be second paragraph, they have to be prosecuted, they can only be prosecuted on a showing that they knowingly and willfully caused or allowed that negligence essentially to continue, and that's how we know Egan's reading of this is incorrect, because if the word owner only meant individual owners, then the reference to corporation in paragraph true would make no sense, and the heightened matreya standards for executive officers of the corporation would not make any sense. But when you look at the rule of lenity and you combine that with the history of the use of this statute, don't we have a very difficult situation here? I don't think so, Your Honor. The rule of lenity, a long-standing doctrine of course, but it's inapplicable, and the reason it's inapplicable is because you only rely on that after recourse to plain language and legislative history leaves the statute ambiguous, and the legislative history, so very well summarized in the Calusa case that we rely on for that legislative history, shows that Congress's intent in this section has always been to expand the extent of liability. Accident after accident happened throughout the 1800s, and they've only gone further and further in expanding liability so as to include corporations as well as individuals, and we think that in light of its legislative history and the plain language of the term owner, and certainly the reference to the owner being a corporation, that the statute allows the prosecution of corporate owners without reliance on the rule of lenity. And briefly, just to get back to collateral estoppel, the other second and critical component of collateral estoppel is the sheer importance of allowing federal criminal law to continue. This is not a case where the government took two bites at the apple. The criminal case was indicted before the civil case. Thank you, Mr. Chapman. Thank you, Your Honor. Anything further, Ms. Christensen? Yes, Your Honor, thank you. I'd like to respond. I've been told by my scientific section back here, there are two other reasons that Oliva would have gone on to the barge. For the pump, the pump could be manually turned to free it up. That's one reason. The other reason is to put the proper flange size on the hose to offload, because Exxon used different flange sizes on their hose than Ameripan did, where the CSO was headed. Talking about the tanks that the CSO came from, the testimony of the trial is that what happened at Exxon, the switching of the tanks, had never happened before. They had never unloaded the CSO in this manner before. The district court talked about a black swan, and the Black Swan Theory, this is the black swan. This is the thing that changed everything. All the loads they had done before, what was different was Exxon's changing of the tanks. I also find it interesting that the government cites time underwater for the pump to disprove the defense's theory that there are no scorch marks, but refuses to admit that the standpipe and the pump spend the equal amount of time underwater, and were altered similarly by the government, and yet those should be admitted without question. I'll talk a little bit about restitution, because we didn't really talk about that at all. The government's correct. The court can order restitution as a condition of probation in the case of the company, and condition of supervised release in the case of my client. That's not what the district court did. The district court didn't make findings at all about that, and as this court knows, supervised relief findings have become more and more scrutinized. No findings were made. What he said about my client specifically was that restitution was mandatory, which would be under a 3663A factor. I'll talk a little bit. I'm jumping around. I want to address the issues. The motion to suppress, there were two motions to suppress. The first one was only two pages, more bare bones, and the district court said, no, I'm gonna deny it, but you have the right to renew that motion, and brought in the use of immunity, but still relied on the fact that Mr. Egan had given statements without being Mirandized, and he needed to be Mirandized. So that second motion brought in much more than the first motion did, and certainly enough to prompt the district court to have a hearing on this issue. And was there, there was no hearing? There was no trial, and if you're looking to see what exactly the statements were, the fire investigator Lamana testified on page 868 of the trial. I asked him what the crew member was doing. He said he went down to the barge to check to see if it was ready to be offloaded. If the valve, if he could open the valve, or for whatever reason, if the stuff was ready to be offloaded. He said, he was then said that maybe there was, maybe there was a torch connected to that propane. It's possible. The captain, the investigator said, I didn't know what a rosebud was, but I later learned that it was a torch. That's the first statement. That comes into this game of telephone that then gets interpreted to being on board the barge, rather than on board the tug, and that he sent Oliva out there to use the torch on the barge, when he just sent him out there to quote, bump the pump and get the stuff ready for offloading. Let's see, and as far as Tchelsky, I rely primarily on our briefs, but all of these factors that Tchelsky did not take into account are significant. The weather, the age, the CSO, the other materials, all of those are significant and change results of scientific testing. I see that I am out of time. I asked that this course reverse. Thank you. Thank you very much. The case is taken under advisement.